Good morning. May it please the court. My name is William Janago. I represent the appellant, Jimmy Luong, and I would like to reserve five minutes of my time. Just keep an eye on the clock. I'll try and help you. Thank you very much. The March 3rd application failed to satisfy the Title III statutory requirements and contravened this court's case law in three separate respects. It did not include a full and complete statement as to the alternative means that have been tried. It did not establish that wire surveillance was necessary, and it used the wrong legal standard, actually, in attempting to make that showing. And third, there were omissions and misrepresentations in the application, and any one of those reasons are sufficient to require that the district court be reversed in this case. Did you argue the omissions and misstatements below? It appears to me that you're raising it for the first time on appeal, and I guess that raises all the issues about why wasn't that waived, because the district court never had an opportunity to consider that. The lawyer in the district court did argue in part that there were misrepresentations having to do with a confidential informant. It is certainly true that I have expanded that argument to include additional assertions in there in ways that it was misrepresenting what actually occurred, but the fact of the matter is that both given that argument in the district court, and it's in the clerk's record at page 294, it's on page 21 of my reply brief where I cite the authority for the proposition that it wasn't waived because it was argued in the district court. And in addition, under this … What's that cite, Mr. Jango, to the district court? It's the clerk's record, 294, pages 9 to 10. And what does it specifically say? How was the argument presented? It argued that the information in the probable cause section stating that confidential source 2 had purchased multi-pound quantities of methamphetamine contradicted the government's claim in the need for interception section. So how does that, you know, I guess, how does that put … I mean, how does that raise the misstatements and omissions that you're raising here? I acknowledge that there are points made in my appellate brief about misrepresentations that were not included in the district court, and I don't want to be heard otherwise. I do think, however, that under this court's case law, that there is intrinsic within the need for interception requirement an obligation on the district court that it examine misrepresentations and omissions. And the citation for that is the Gonzalez case. And that's also on page 20 of my reply brief. And another thing I think, Judge Callahan, that's very important here is that it would be the ultimate irony if, because of the omissions and the misrepresentations that really require an inordinate amount of time to figure out here, are not able to be recognized simply because they're so difficult to figure out. And that's why when you raise it in the district court, it allows the government an opportunity to respond. It allows the district court to develop the record. So that's a problem of raising things for the first time in appeal. But let's just assume, for argument's sake, that you preserved it. Even that, what are your misstatements and omissions, and how are they material? The need for interception section talked about physical surveillance. And it said that they had surveilled Mr. LeBlanc on February 4th, the 21st, and the 22nd. And it did not say anything at all about the City of Industry warehouse. It then went on to say, on February 4th, when we conducted the surveillance at the City of Industry warehouse, we saw a poll camera, and therefore it's too risky to surveil that location. That was the statement that they made, saying that as of February 4th, to conduct surveillance at the base of operations, which is their words, that's what they called it, would be too risky. Well, it turns out that they surveilled it on the 21st of February, the 22nd of February, and the 23rd of February, and the 26th of February. So the one that's left out is the 26th? It's left out, and the other information that you learn about the other surveillance that was at the City of Industry warehouse is in the probable cause section, which is 15 pages earlier in the application. Can you figure that out? Yes, you can, if you've got the time and you are going to go through the painstaking detail that's necessary to figure that out. But I would submit that when you represent in the affidavit that as of February 4th, it was too risky to surveil this location, that's misleading when you know that a few days earlier, on February 26th, you in fact conducted surveillance, and you've been conducting surveillance throughout the month. And there's another important point here. So what is the omission that the court doesn't have? The court did not, the one thing that was absolutely not included anywhere in the March 3rd application was the February 26th surveillance, which was close in time to the application. So the government certainly should have known about that. The only reason we know about that is because they included it in the next application. And there's another important point. Let me stop you. Why shouldn't we treat this the same as we would a Frank's omission or misrepresentation, excise the challenged portion and then look at whatever remains in the affidavit in support of the Title III application and applying a totality of the circumstances test to ask whether or not there's still sufficient factual allegations to establish probable cause for the issuance of the wire? Under this court's case law, both Blackman and Gonzalez, the standard is where you find omissions and misrepresentations, you then ask the question, if you include that information and correct the misrepresentations, could, and that's an important word, could a district judge find that the necessity showing has not been satisfied? It's not doing the same thing? It is, basically. I just wanted to articulate it in the context. It's kind of a mirror image of a... I agree. I agree. Absolutely. I think it's equivalent to the Frank's test, and it's in the context of this proceeding right here. And if you apply that test here, if you know, and we're not talking just about surveillance here, because remember, one of the other things that was going on is you've got a confidential source that is able to call up Mr. Luong and arrange a deal whenever the government wants. And so you've got a confidential source that is in direct communication with Mr. Luong. They're able to monitor the conversations. But that almost, take that argument to its logical extreme, that almost suggests that the government can never get a Title III application if they have a confidential informant that has access to the target. And I don't think any of the cases that I've read say that. And I wouldn't suggest that that be the law. I think that what you have to do is you have to look at all of the alternative means that were available to the government here, because it just wasn't in this confidential source, too. It was also they had a GPS tracking device on his phone. They were able to conduct surveillance at the city of industry base of operations. That doesn't give you all that wonderful circumstantial evidence and the telephone toll link analysis and all this proof that we see in these kinds of cases doesn't give you the content of the conversation. It doesn't give you in the defendant's own words setting up the drug deals, arranging for the delivery of the money, all that stuff that you and I both know jurors just soak up at a trial because it's so powerful. I understand. And the question is whether or not they made an adequate showing that they needed that at this point in the investigation. So I'm not saying they couldn't have gotten there. All I'm saying is that this application did not comply with the statute. What would be your best case to say? Because obviously you can argue that they could have done other things, and I wouldn't disagree with you on that, but you don't get to decide what they could have done. It's just, is it enough? Did they show necessity? So what's your best case factually relative to this case? The best case is United States v. Blackmun, and as I point out in the brief, in Blackmun the omissions and misrepresentations that were found material really line up with those here. I mean, Judge Wilson thought that the confidential source was very limited in what his knowledge is. On page three of the excerpts of record, he relies on that specific fact in saying, well, they need to listen to the conversations here. The reality is quite different when you go back to the probable cause section of the application and you see that they have detailed information about this individual, and they are able to not only conduct XTC transactions but multi-pound methamphetamine transactions. So even Judge Wilson was misled here, and Blackmun really gets you to that point. And the one other thing I want to make before I sit down and preserve my rebuttal time is that remember what you have here. In the probable cause section there is a statement on page 32 of the excerpts of record where it says we're not telling you everything about probable cause. We're just telling you enough to establish probable cause. That means there's a lot more going on here that we don't know about. If you go over to the need for interception section, it's just bare bones. So the point really is that when you've got a probable cause section, which makes a much more complete showing as to the alternative means that were available to the government, and even the government admits that that's incomplete, then you have not complied with the full and complete statement required of the statute. Is your position that they have to lay out every single investigative fact that they know? No, absolutely not. I don't think you need to go there. What they can't do is they can't make it appear to the district court that they can't, for example, surveil the base of operations when they're doing it at the same time they're making that representation. I'll reserve the rest. All right, very well. Let's hear from Mr. Jenkins. Good morning. May it please the court, Mack Jenkins on behalf of the United States. And I'll try and just directly respond to some of the points raised by the court and Mr. Janego. Why don't you go directly to the February 26th surveillance? You know, why shouldn't evidence derived from the first wiretap be suppressed based on the government's failure to include details on the February 26th surveillance activities? Yes, Your Honor, and I answer it this way. First, that's one thing we agree on. That February 26th surveillance is not in that first affidavit. But what becomes relevant and why, to answer your question why we believe it's immaterial, that omission, because it is not in that affidavit, is in the second affidavit it's included. It's included in the probable cause section. It doesn't help you on the probable cause for the first one, does it? It doesn't, but it provides context to show that it was immaterial because the judge granted that second affidavit. Well, it's your concept that it was immaterial. It's not necessarily the law's. Correct, correct. But when Judge King reviewed that second affidavit, the purported omission that Mr. Janego thinks obviates necessity entirely just based off that one surveillance is included in the second affidavit. So is your position that the declarant just inadvertently left it out and then corrected it in the second declaration? Inadvertently left it out and then included it in the second, yes. And the reason, and this actually goes back to the original question about why we believe it's been waived, is we could have developed more of the record as to what happened and why this February 26th wasn't in there. There would have been testimony about the first affidavit was filed March 4th. The surveillance was done that was omitted February 26th. It wasn't done by the case agent who's writing the affidavit. The way affidavits are written is Pete Johnson, the special agent, is getting information from Beverly Hills PD, from local law enforcement, from other federal agencies. He becomes the clearinghouse of all this information of the investigation. Okay, so this is sort of out of the record, though, right, what you're telling us now. So if he had raised it down below, you're saying that's what you would have said. Exactly, Your Honor. And that's why it should be waived because that's why it should have been raised below. But let's, okay, but it wasn't. And I'm not particularly buying your argument that it was somewhere else and that's why it's immaterial. So tell me why it was immaterial otherwise. Certainly, because the information that was omitted was essentially they observed on February 26th an individual who was a target subject go to the industry warehouse. They didn't know what was in the package, but they saw him get something. They followed that individual from the warehouse to a second spot where that individual met with some other unknown person. There appeared to be some sort of transfer of bags there. Then they followed that newest person to an unknown house where that bag seems to go into this unknown location with unknown product being delivered. So is it cumulative? Is that what you're saying? Yes, Your Honor. It's cumulative because all of that, it wasn't very helpful. And that process, the fact that we do believe there's likely some sort of narcotic or contraband or money being transferred, but that was already in the first affidavit. As Mr. Ginego pointed out, we were already well aware, and we made the court aware, that this industry warehouse was certainly a hot spot to surveil. We were interested in it, and that's all in the first affidavit, which shows that we weren't hiding the fact that this, that we had some success. But as Judge Talman pointed out, it was superficial success. Just how we described that. I didn't say it was superficial. I said there's a qualitative difference between the evidence that you obtain on a wire and what you prove circumstantially with GPS devices and telephone toll analysis. Correct. And we would analogize that to the February 26th surveillance where it looks very suspicious what happened, but we don't know if the middle guy was the main one setting up the transaction. We don't know what was in the package. We don't know who was in the house and whether he was a small-level buyer. And by the time it got to him, he was buying a few ecstasy pills. But really, and what this case was about, and that's important to the government, is our information that he was dealing in the millions of ecstasy pills. Ecstasy pills at $20 retail, we're talking about $20 million of ecstasy pills alone. There's also manufacturing meth. So we were trying to find out the big players, the suppliers, and where all this money was going in a $20 million drug industry just on ecstasy alone, and we couldn't find that. And we certainly couldn't find it by following people to houses and then just guessing what made it to that house. And so that ties back into the fact that this first affidavit made clear that one of the main objects was to surveil this industry warehouse. But in addition, we wanted to find out how was he getting ecstasy into the country. The CS is in the record that she believed he got it from a foreign source. We believed it was Canada. We were trying to figure out, obviously, a higher player on the chain. Who was bringing it into Canada? Who brought it from Canada to Los Angeles? And then where was that money going? We surveilled the residences. We surveilled the cars. A lot of money was changing hands, but we didn't see any mansions. People weren't driving Ferraris. But that money was going somewhere. And we knew Jimmy Luong, certainly. We could have arrested him very early on, and he was the focus. But the focus of the investigation was dismantling the entire network. That was lucrative. It was productive. It dealt in polydrugs, multiple drugs. And we really had a narrow picture focused on Luong. He's bad. We can take him down. But we didn't want to take him down for 2,000 pills or 3,000 pills, which is CS2. So where was he in the chain of who you arrested? He was the centerpiece, but he had a lot of hub-and-scope conspiracy. He had a lot of people connected to him. He had a meth conspiracy. Ultimately, it's charged in the indictment that in that industry warehouse, he was manufacturing huge amounts of meth. And I take it that when he was stopped and arrested by the Los Angeles County Sheriff's deputies, that that was not orchestrated by the Drug Task Force. That just happened to be sort of Mr. Luong's bad luck. Yes, Mr. Luong's bad luck, our good luck. We were very surprised that that happened, given that he was. But you weren't ready to arrest him at that point. We were not, and he was released shortly thereafter. On the state charge. Correct. This was sort of a Maxwell Smart type of thing. Apparently so. Apparently so. Sometimes we luck out, and I was very surprised to get that. But exactly, that's what happened. But at that point, again, even if we'd arrested Mr. Luong, we still wouldn't have known enough about Tony Barrera, where the money was going to, and how he was getting it from Canada. Well, speaking of new arguments that I already, your opposing counsel, that I already questioned him on New York arguments, I guess the government's decided now that you don't need probable cause and that it's reasonable suspicion, and somehow for the first time on appeal, you've decided that you've got a gangbanger that isn't a gang, that is known for selling drugs, he's got tats, there's pills on the floor, that you could search for a gun, which was in fact found. Why did the light bulb just go on on appeal? I think partly because the concern was once Mr. Luong was taken out of the car and put in the police car and was detained, that's when the search actually took place. Well, but my experience is that, you know, I mean, I'm not an officer, but I've heard a lot of these cases, and I've heard that the first thing that they're concerned about is someone grabbing a gun. But now that you come up on that, it just seems very odd that no one thought to argue that previously. Yeah, and that was, it seems to be one of the questions that Judge Wilson asked, and I was trial counsel of me at the beginning. But my concern at that point, because I actually wasn't ready for that argument at the time, was simply that whether that changed, because he didn't conduct the search, why Mr. Luong was still in the driver's seat. They didn't come out with guns blazing and looking right in there because he thought he was moving for a gun or looking at a gun. Was this right after the Supreme Court decided, I can't remember the name of the case, but the question whether or not you could, in essence, incapacitate the driver and still have... I know it was around the time, because I remember thinking that, did that negate whatever reasonable suspicion to go into the car for a gun if the deputy and his partner are now the only people that are close to that gun? Right, I mean, it's a question of whether or not they're, not whether reasonable suspicion dissipates, but whether or not their fear of being attacked has been dissipated by virtue of the incapacitation of the driver in the cage car. That is correct. And that's my understanding of where, at least at that time, the Supreme Court was considering that argument. And in our view, we thought the totality of circumstances was sufficient for probable cause. So essentially, I focused on, in my view, the easy argument that I didn't think was going to be undercut by the Supreme Court or have been around that time, because based off Deputy Duong's testimony, including that Judge Wilson himself gave very probing and challenging questions, but yet found incredible, in our view, the totality of circumstances well-established probable cause. So I was less concerned with that alternative argument. However, on appeal, as we note, from the entirety of the record, this panel is allowed to affirm on any grounds that appears sufficiently therein. So is the record developed for either of those arguments? For the totality of the circumstances probable cause, yes. For the reasonable suspicion, it is. I think the reason it is a footnote is because it isn't. I wouldn't say it's overwhelmingly supported by any means. But the fact that Jimmy Duong was an admitted gang member in the Chinatown Boys, obviously the fact that a gun came later was not a determination, but he's in a small car. The deputy sees what he believes to be drugs. The car is associated with a drug warrant. It is in his declaration that Deputy Duong has a heightened sense of awareness at that point, learning this information, gang member, drugs. What does the record say about the type of tattoos that he has? Yes. The record reflects that Jimmy Duong has Chinatown on his upper back. And that is in the record on the attachment to Tony Duong's declaration. Did the deputy see that, like on the back of his neck? Correct. And that is also in there. He says what he first sees, and this is from his testimony. I think at this point it's Judge Wilson asking the questions. He sees a tattoo on his neck. He also sees teardrops on his face. Did they develop what teardrops mean? They did. And Judge Wilson asked him that. And he said it's a very frequent indicator of gang membership, including the actual violent activity on behalf of that gang. And Judge Wilson asked him, so that was the main indicator to you. That led you to ask the question, are you in a gang? Deputy Duong testified yes. But just to supplement that, the fact that he had Chinatown boy or Chinatown on his back, the description is that apparently Deputy Duong could see that. And so I think the combination of the two, the teardrop, the tattoo, referencing his own gang on his upper back, meaning if he's wearing a T-shirt, it did appear from the testimony that he could see it, Jimmy Duong at that point knew he wasn't going to lie to this investigator that could probably quickly figure out that he was associated with a gang. Therefore, in our view, that's why he quickly admitted, yes, I'm in a gang. You're going to find that out anyway. You can see my tattoos already since you asked about them. And so that's, I think, led to Deputy Duong's further actions and further heightened sense of awareness to be aware of what this gang member had in his car, especially after seeing the pills. Those are the central points that the government wants to make, unless anybody on the panel would have to answer. I don't think we have any questions. Let's let Mr. Ginego have the last word. Thank you. Thank you. I just wanted to make two points. One is that the standard that the government used to show necessity here is that none of the alternative means individually was adequate to accomplish the objectives of the investigation. That was the statement they made. They stand by that in their brief here, saying that's all they have to do. If any one of these are insufficient to accomplish all of the objectives, the government's position is that's all we need. And I think that that is contrary to the court's case law. Is that their position? I thought their position was that you have to lay out all of the traditional non-electronic investigative means and explain utilizing each factor why it is sufficient to get the investigation to accomplish the goals of dismantling the drug trafficking organization. That's not how I read it. I read it to say what ‑‑ I read it to defend their statements in the application, which is that this method by itself will not achieve all of the objectives. And the government's brief at page 27 comes back, I believe, and says that's all we have to show. And for that reason alone, I think it was a deficient showing here. The second point that I wanted to make is that it is true that there is no substitute for intercepted voice communications that are recorded. On the other hand, you do have someone here who is doing consensual monitoring and, more importantly, and they were able to ‑‑ But consensual monitoring, you know, wiring up a CI and sending them in to negotiate a drug transaction is one thing. Putting a tap on what turns out to be the ring leader's phone and hearing him talking about tens of thousands of pills and millions of dollars in proceeds is a whole lot more compelling if you're trying to dismantle the whole organization. Well, the CIs, too, are not really model citizens generally. I understand, but ‑‑ And I think CI3, like, proved that point, getting picked up for ‑‑ they had to dump that one because he or she picked up a violent crime, right? That's correct. That's the CS2. CS2, it was not in‑person monitoring. It always are. They had CS2 make a call on February 4th, and they talked about past transactions and future transactions. My final point, though, and the one that I wanted to get to, is it's not that they might not have been able to get there. The point really here is whether this application complied with the statute, and I think that's where the shortcoming is. Not that they couldn't have done it, but there's a duty of candor when you're making an ex‑party application to a judge with a voluminous affidavit. You have to be straightforward. You can't say in the need for interception section, we can't go to the base of operations when you know you're doing it. And that's not consistent with the statute, and it's not consistent with the court's case law. They might have been able to get there. This application didn't do it. Thank you very much. Thank you both. The case was very well argued, and it is submitted for decision. We are adjourned, and thank you both very much. Thank you.
judges: Tallman, Clifton, Callahan